## HORNSBY *v.* STATE.

### Opinion delivered March 31, 1924.

1. HOMICIDE—CONVICTION OF MURDER—EVIDENCE.—Evidence, giving it is strongest probative force in favor of the State, *held* to support a conviction of murder in the first degree.

2. CRIMINAL LAW—DEMONSTRATIVE EVIDENCE.—In a prosecution for murder, testimony as to blood-stains on bedclothes and on the clothing deceased wore at the time he was killed held admissible as part of *res gestae* and to throw light upon the rencounter.

3. HOMICIDE—ADMISSIBILITY OF LOVE LETTER TO DECEASED'S WIFE.—In a prosecution for murder, admission of love letters written by accused to deceased's wife while both were in jail was proper as tending to prove a motive for killing deceased.

4. HOMICIDE—INSTRUCTIONS AS TO SELF-DEFENSE.—In a prosecution for murder, an instruction on self-defense which told the jury that, if defendant brought about the difficulty, he could not plead self-defense unless he honestly and in good faith withdrew from the difficulty, *held* not objectionable as justifying the inference that defendant could not plead self-defense if his conduct in making love to deceased's wife was the cause of deceased making an assault on defendant, where the court, in another instruction, told the jury that such conduct on defendant's part would not justify an assault by deceased.

5. CRIMINAL LAW—INSTRUCTION—SPECIFIC OBJECTION.—Where counsel for the accused in a prosecution for murder desired an affirmative definition of what was meant by the phrase "brought about this difficulty" in the instruction on self-defense, he should have requested it.

Appeal from Monroe Circuit Court; *George W. Clark,* Judge; affirmed.

*Bogle & Sharp,* for appellant.

1. The evidence does not warrant a conviction of murder in the first degree. Under the state of facts presented in the record, the State has failed to prove that premeditation and deliberation essential to a conviction of murder in the first degree. 119 Ark. 85; 36 Ark. 127; 51 Ark. 189; 60 Ark. 564; 68 Ark. 572; 82 Ark. 97; 92 Ark. 120; 100 Ark. 330.

2. It was error to permit evidence to be introduced that, a day or two after the killing, blood was found on one of the beds and on a quilt found in one corner of the

room, and to permit the blood-stained clothing of the
deceased to be exhibited to the jury. There was no con-
nection between these things and the facts which the
State relied on for a conviction, and this evidence was
calculated only to excite the minds and inflame the pas-
sions of the jury. 39 L. R. A. 719. It was manifest
error to permit the introduction in evidence of letters
written after the defendant had been placed in jail. They
were written too long after the killing to be admitted
as a part of the *res gestae.* Moreover, they neither in
fact nor by innuendo refer to, or relate to, the crime
with which the defendant was charged. 3 Wigmore, Evi-
dence, § 2113; 90 N. E. 48; 106 N. E. 78; L. R. A., 1915D,
236; Ann. Cases, 1915D, 162; 68 So. 934; 141 S. W. 216;
16 C. J. 543.

3. Instruction E given by the court was erroneous
in that it ignored the principle that, regardless of who
might have brought on the difficulty, the defendant was
not required to retreat, but could stand his ground, and,
if need be, kill his assailant in order to save his own life
or prevent great bodily harm. 73 Ark. 399; 67 Ark. 603.
Instructions F and G, which discussed the facts in the
case as they appeared to the court, were erroneous
because argumentative and contradictory of other in-
structions, and objectionable because too long to be
clearly understood. 43 Ark. 289; 45 Ark. 165; 49 Ark.
165; 55 Ark. 244; 125 Ark. 260; 130 Ark. 234; 85 Ark.
48; 89 Ark. 213; 39 Ark. 360; 54 Ark. 588.

*J. S. Utley,* Attorney General, *John L. Carter, Wm.
T. Hammock, Darden Moose* and *J. S. Abercrombie,*
Assistants, for appellee.

1. The evidence, the facts and circumstances in
proof, were sufficient to justify the jury in returning a
verdict of murder in the first degree; to justify them in
inferring the killing, and that defendant had delib-
erately planned to kill deceased, or to engage him in a
quarrel in order to have an excuse for killing him. It
shows also that deceased was unarmed, and attempting
to escape from the house when he was shot down. There

is present all the essential elements of murder in the first
degree.   92 Ark. 120; 51 Ark. 189; 68 Ark. 572, 576; 119
Ark. 85, 92; 133 Ark. 321, 324; 101 Ark. 443, 448.

2.  No objection was made to the testimony to the
effect that, the next morning after the killing, blood,
which appeared to be damp and fresh, was found on the
bed-clothing, at the time it was given, and its exclusion
on objection being made thereafter, was discretionary.
However, it was competent for the purpose of throwing
light on the issue.   156 Ark. 464; 78 Ark. 285; 103 Ark.
166.   Objection to the introduction of the bloody overalls
worn by the deceased was not incorporated in the motion
for new trial, and cannot be urged here, but must be con-
sidered as waived.   91 Ark. 441, 121 S. W. 732; 150 Ark.
387.   The letters written by appellant to the wife of the
deceased were competent as tending to show a motive
for the killing, and to shed light upon the relationship
of the parties prior to the killing.   13 R. C. L. 747, § 51;
71 Ark. 112, 117; 149 Ark. 642, 648.

3.  Instruction E conforms to C. & M. Digest, § 2375,
and correctly declares the law of self-defense.   95 Ark.
428; 109 Ark. 378, 382; 116 Ark. 17, syl. 4; 120 Ark. 350.
The instructions requested by the appellant presenting
his theory of the case, from the standpoint of self-defense,
were not improperly refused, because the court had cor-
rectly covered the law of self-defense in the above in-
struction and in its instructions D and G.   130 Ark. 204,
209.   Instructions F and G were not so long as to affect
their clearness or correctness.   Neither were they argu-
mentative, or, at any rate, not so much so as to result in
prejudice to the appellant.   14 R. C. L. 775, § 42.   Appel-
lant should have made specific objection if he considered
instruction F to be misleading.   110 Ark. 403, syl. 6.

Wood, J.   The appellant rented a small farm in
Monroe County, on which he and his wife and children
resided until the summer of 1923, when his wife died, and
appellant and his children went to live with his mother,
who resided near by.   Walter Fells, who was twenty
years old, and his wife, who was sixteen, lived on a farm

about one and three-quarter miles from the appellant. After appellant's wife died he entered into a contract with Fells, by which Fells and his wife were to move into the house on the place where appellant and his wife lived prior to her death, to assist appellant in gathering the crop. Soon after Fells and his wife moved on the place, appellant and his children moved back into the house with them. Mrs. Fells was to do the cooking and take care of appellant's children. Shortly after appellant became acquainted with Mrs. Fells, and before she and her husband had moved into appellant's house, he had made love to her. He told her that he loved her from the first time he saw her.

Without setting out the testimony in detail, suffice it to say it tended to show that there was improper intimacy between appellant and Mrs. Fells even before the Fells moved into appellant's house, and that it continued up to the time the appellant killed Fells. Appellant had told her that, if she would be his, he would buy her everything she wanted. He had ordered her some clothes about a week before he killed Fells. They had talked about leaving together, on the Sunday before the killing occurred. Fells and his wife and the appellant had all been living in the house together about a week, and appellant was continuing his love-making to Mrs. Fells. Mrs. Fells and her husband had had some trouble; he told her that he would cut up the clothes appellant bought for her, and appellant said that he wouldn't. This was about a week before the killing. Appellant thereupon loaded his guns. One was a nineteen-inch-barrel gun and the other was a twelve-gauge. On the night of the killing, after supper, Fells went to bed, and appellant and Mrs. Fells were sitting across from each other at a small table, talking. Appellant wrote something on a mail order blank, and handed it across to Mrs. Fells. Fells observed it, and got up and put on his clothes and walked over to the table where they were sitting. Mrs. Fells turned the paper over and began drawing on it. She then tore it, and put a part of it in her mouth. Fells

thereupon slapped her, and told her to go to bed. She then started towards her bed and appellant towards his, and Fells walked out on the front porch. When he came back into the room, Mrs. Fells was standing by her bed and appellant was sitting on a trunk at the foot of his bed, unlacing his shoes. As Fells came into the room he was saying something, but neither appellant nor Mrs. Fells understood what it was. Appellant then inquired of Fells whether he thought that appellant was the cause of the trouble between him and his wife, and Fells replied, "By G——, you wrote that," and appellant said, "Well, you G—— d—— son of a b——, grab your gun." Appellant reached back and got his gun, and Fells ran towards the middle door and Mrs. Fells ran toward the front door, and as Fells opened the door it threw him towards the appellant, and appellant shot him in the stomach. Mrs. Fells testified that she did not see anything in her husband's hand when he re-entered the room. She described the room and the situation of the parties at the time of the shooting. Appellant laid Fells down. She ran up and asked him to let her have the gun, and told him that he ought not to have done that. He replied, "Did you want me to get killed?"

Wes Bryant, a near neighbor, who heard Mrs. Fells scream, ran over and arrived about the time Fells died. When he arrived, appellant was holding Fells' head with his right hand and had his left hand over Fells' stomach. Appellant told witness to go for a doctor, but witness replied that it was no use. On witness' first trip he did not see anything of a knife. He went home, and returned soon thereafter, and when he got back the second time he saw a knife sticking in the floor, where the appellant called his attention to it. Appellant then exhibited to witness a place on his arm which looked like some one had grabbed him, and had the prints of finger nails as if some one had scratched him, and appellant told witness that Fells had struck at him with a knife, and that he had to shoot him. He said to witness that, if he could not do him any good not to do him any harm, and asked

Mrs. Fells if she could tell it like it was, and she replied that, when Fells started toward the door she thought he was trying to run, and appellant replied, "No, he aimed to shut the door and whirl on me."

It was shown that Fells was shot in the center of the stomach with shot that looked like buckshot. The shot ranged down, and was at close range. The State, without objection of appellant being offered at the time, introduced evidence to the effect that, on the morning after the killing, there were blood stains, yet damp, on the sheets and quilts, and permitted the State to introduce the clothing that Fells had on at the time he was killed. After the State rested, the appellant moved the court to exclude the evidence as to the blood stains on the bed clothing and the clothes worn by Fells at the time he was killed. The court ruled that the jury could consider the testimony to determine the entire facts in the case, to which ruling appellant duly excepted. The court, over the objection of appellant, permitted the State to introduce certain letters written by the appellant to Mrs. Fells after he and Mrs. Fells were put in jail. The court, in refusing to exclude this testimony, ruled that the same "is admitted for the purpose only of showing the motive for the killing, if they do show any, and the relationship of the parties prior to the killing, if these letters shed any light upon that situation."

On behalf of the appellant the testimony tended to prove that, when he asked Fells the question whether he thought appellant was the cause of the trouble between him and his wife, Fells was standing with an open knife in his hand, and replied that appellant had written to his wife, and cursed appellant. Fells then started toward the door and in the direction of the appellant. As Fells came on appellant with his knife, appellant reached back for his gun, and, as he came up with it, Fells grabbed the end of the barrel. A scuffle ensued. Fells cut appellant's shirt, his arm and his finger, and was striking at him with his knife when appellant shot him.

Among other instructions, the court gave the following: "No. E. The defendant seeks to justify the killing under a plea of self-defense. On this plea you are instructed that the plea of self-defense cannot avail the defendant in this case unless he was without fault or carelessness upon his part, and must have used all means within his power, consistent with his safety, to avoid the danger and avert the necessity of taking the life of the deceased, and if you find from the evidence that the defendant brought about this difficulty, then he cannot plead self-defense, unless he honestly and in good faith endeavored to withdraw from this difficulty before firing the fatal shot which caused the death of the deceased." The appellant made the following objection to instruction No. E: "Because it does not give a correct definition of the law of self-defense, and because it tells the jury that, if the defendant brought on the difficulty, he could not act in self-defense in taking the life of Fells, and for the further reason that it is abstract and misleading."

Among other prayers for instructions, the appellant asked the following: "No. 2. You are instructed that if, at the time the defendant shot the deceased, he had reasonable cause to apprehend great bodily harm at the hands of the deceased, and if at the time he had reasonable grounds to believe, and did believe, it necessary for him to shoot as he did, and that he acted without previous fault or carelessness on his part, then the killing was justifiable, and it was not necessary that the danger to the defendant should have been actual or real, but it was sufficient if the defendant had reasonable cause to believe that he was in danger of death or great bodily harm, and acted upon the belief."

"No. 6. The defendant claims that the killing was justifiable because done in necessary self-defense, and you are instructed that, in determining whether the killing was necessary, the defendant had the right to be governed by the situation as it appeared to him at the time, so that, under the law, if, from the appearance, the

defendant honestly believed, without fault on his part, that he was in danger of losing his life or receiving great bodily injury from his assailant, he was as much justified as if the danger had been actual or real."

The court refused these prayers, to which ruling the appellant duly excepted. The jury returned a verdict finding the appellant guilty of murder in the first degree and fixing his punishment at imprisonment in the State Penitentiary for and during his natural life. From the judgment of the court entering sentence in accordance with the verdict is this appeal.

1. The appellant contends that the evidence is not sufficient to sustain the verdict. We have set forth substantially the facts which the testimony on behalf of the State and appellant tended to prove. Giving the evidence tending to prove murder in the first degree its strongest probative force in favor of the State, we are convinced that the testimony was sufficient to sustain the verdict. There was testimony from which the jury might have found that the appellant and Mrs. Fells, as we have stated, were in a liaison, which furnished a motive on the part of appellant for the killing; that appellant, at the time of the killing, deliberately took the life of Fells, when he knew that he was in no immediate danger of death or great bodily harm at the hands of Fells. There was testimony from which the jury might have found that there was malice aforethought, and premeditation and deliberation essential to constitute murder in the first degree. True, the testimony of the appellant tended to prove to the contrary, but this conflicting evidence made the issue one for the jury. See *McIlwain* v. *State,* 101 Ark. 443-448, and cases on point in brief of the Attorney General.

2. The court did not err in refusing to exclude the testimony as to the blood stains on the bedclothes, nor as to the clothing Fells had on at the time he was killed. These were of the *res gestae,* and were relevant. They were a part of the surrounding facts of the rencounter and were admissible for whatever light they might throw

upon it.  See *Spivey* v. *State,* 114 Ark. 267; *Carr* v. *State,* 43 Ark. 99.  In *Bennett* v. *State,* 95 Ark. 100-105, we said:  "It was proper testimony to disclose to the jury the situation of the deceased and his articles of clothing, and all the circumstances of the place where the killing occurred."

3.  The court did not err in permitting the State to introduce the letters of the appellant to Mrs. Fells after they were put in jail.  These letters were identified as the letters of the appellant, and he does not dispute that they were his letters.  They were filled with protestations of love for Mrs. Fells, and tended to corroborate her testimony to the effect that appellant was in love with her at the time he killed Fells, and tended to prove a motive on the part of the appellant for killing Fells.  *Stokes* v. *State,* 71 Ark. 112-117.  "The State may show the existence of a motive for taking the life of the deceased in determining guilt or innocence of the accused."  *Avery* v. *State,* 149 Ark. 642, and cases there cited.  See also *Sneed* v. *State,* 159 Ark. 65-74.

4.  The court did not err in giving instruction No. E.  The principal objection made is to the concluding language of the instruction, which told the jury that "if the defendant brought about this difficulty, then he cannot plead self-defense unless he honestly and in good faith endeavored to withdraw from this difficulty before firing the fatal shot which caused the death of the deceased."  The appellant contends that, under the language of the instruction above quoted, the jury might have concluded that the appellant's action and conduct toward Fells' wife was the cause of the assault made on appellant; and, if such was the case, that the appellant did not have the right to stand his ground and defend himself, although he was in immediate danger of being killed or receiving great bodily injury.  Counsel for appellant would be correct in this contention if the language of the instruction were fairly open to the construction which they now place upon it.  But the court granted appellant's prayer for instruction No. 13, in

which the court told the jury that, "although they might believe that the defendant made love to the wife of the deceased before the killing, yet this would not justify the deceased in making an assault upon the defendant." So we think it clear, when the instructions are considered together, the court, in the language of instruction E, set out above, did not intend to instruct the jury that, if the appellant brought on the difficulty by his action and conduct towards Fells' wife, he could not, in that event, stand his ground and defend himself from death or great bodily harm in an assault that was being made upon him by Fells. Such an interpretation of the court's instruction would make it in conflict with instruction No. 13. When these instructions are read together, the jury would have had no right to conclude that the making of love to the wife of Fells by appellant brought on the difficulty and thus precluded him from standing his ground and defending himself from a murderous attack by Fells. The court, in effect, told the jury, under these instructions, that, if the appellant, by word or act other than making love to Fells' wife, brought on the difficulty, then he could not plead self-defense until he had endeavored in good faith to withdraw from the difficulty before firing the fatal shot. The instructions, as thus construed, are not in conflict, but harmonize with each other, and instruction No. 13 explains the language complained of in instruction No. E. If counsel for appellant conceived that the language of instruction E, as quoted, was ambiguous and susceptible of the construction they now place upon it, it was their duty to direct the attention of the trial court specifically to this language and to ask the court to define specifically what it meant by the language, "brought about this difficulty." The court, at the appellant's request, had negatively, at least, defined what the words "brought about this difficulty" meant, in saying that it was not making love by appellant to the wife of the deceased. If counsel for appellant desired an affirmative definition of what was meant by the lan-

guage in the instruction, ''brought about this difficulty,'' they should have asked it.

The charge of the court as a whole is too long to embody in the opinion, but we have carefully read and considered all of the instructions that the court gave, and it occurs to us that the court meant to conform his charge on self-defense to the language of this court in *Ferguson* v. *State,* 95 Ark. 428-431, where we said: ''No one, in resisting an assault made upon him in the course of a sudden brawl or quarrel, or upon a sudden encounter, or in a combat on a sudden quarrel, or from anger suddenly aroused at the time it is made, or in a mutual combat, is justified or excused in taking the life of the assailant, unless he is so endangered by such assault as to make it necessary to kill the assailant to save his own life, or to prevent a great bodily injury, and he employed all the means in his power, consistent with his safety, to avoid the danger and avert the necessity of killing. He cannot provoke an attack, bring on the combat, and then slay his assailant, and claim exemption from the consequences of killing his adversary on the ground of self-defense. * * * After having provoked or invited the attack, or brought on the combat, he cannot be excused or justified in killing his assailant for the purpose of saving his own life, or preventing a great bodily injury, until he has, in good faith, withdrawn from the combat as far as he can, and done all in his power to avoid the danger and avert the necessity of the killing.'' See *Carpenter* v. *State,* 62 Ark. 306-307, and cases there cited. Also *Arnott* v. *State,* 109 Ark. 378; *Plumley* v. *State,* 116 Ark. 17; *Yancey* v. *State,* 120 Ark. 350.

The court did not err in refusing to grant appellant's prayer for instructions Nos. 2 and 6. These related to appellant's plea of self-defense, and were fully covered by instructions on that subject which the court gave. Appellant complains that certain instructions given by the court on its own motion were too long to be clearly understood, and that they were argumentative and contradictory of other instructions given by the

court. We find these instructions unnecessarily long, but they are not misleading. They are hypothetical in form, and do not erroneously declare any proposition of law embodied therein, and do not misapply the law to the facts. After a consideration of the entire record we find no reversible error in the rulings of the trial court, and its judgment is therefore affirmed.